*439 Judgment, Supreme Court, Bronx County (Betty Owen Stinson, J.), entered September 13, 2011, dismissing the complaint as against defendants-respondents Mary Reed, M.D. and Bronx-Lebanon Hospital Center, and bringing up for review an order, same court and Justice, entered July 25, 2011, which granted defendants-respondents’ motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the judgment vacated, the motion denied, and the complaint reinstated. Appeal from the foregoing order, dismissed, without costs, as subsumed in the appeal from the judgment.
In this medical malpractice appeal, defendants do not dispute that they departed from the accepted standard of care by incorrectly informing plaintiff that her April 9, 2007 PET scan was negative for recurrent cancer and not correcting that misinformation until November 2007. Defendants argue that the six-month delay in notification did not cause plaintiff any injury. Defendants met their initial burden of establishing their entitlement to judgment as a matter of law (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]). However, the motion court erred in finding that plaintiff failed to raise an issue of fact requiring the denial of defendants’ motion and a trial. The issue of whether a doctor’s negligence is more “likely than not a proximate cause of [a plaintiffs] injury” is usually for the jury to decide (Stewart v New York City Health & Hosps. Corp., 207 AD2d 703, 704 [1st Dept 1994], lv denied 85 NY2d 809 [1995]).
In November 2001, plaintiff was diagnosed by nonparty Montefiore Hospital Center with stage IIB breast cancer of her right breast. She underwent a lumpectomy followed by radiation and chemotherapy. Plaintiff continued treating at Montefiore through 2006 at which time she transferred to defendant Martin Luther King, Jr., Health Center, a clinic affiliated with Bronx-Lebanon Hospital Center, where she consulted with defendant Dr. Reed. After discussing plaintiffs history and hearing her complaints of back pain and pain in her right arm, Dr. Reed ordered a bone scan, a PET scan and some other tests to “rule out metastasis.” On the April 9, 2007 pre-certification PET scan form Dr. Reed wrote that “[i]f the PET scan is positive, patient will be initiated on hormone therapy and/or chemotherapy.” At her deposition, Dr. Reed testified that it is her “custom and practice” to tell a patient that if the PET scan comes back with a positive result showing a recurrence of cancer, the patient will be advised to undergo hormonal therapy. Plaintiff underwent all of the tests that Dr. Reed ordered, including the PET scan. The report of the PET scan was issued on April 30, 2007.
*440 On July 2, 2007, plaintiff had a follow up visit with Dr. Reed who told her, erroneously, that the PET scan was negative for recurrent disease when, in fact, the scan had revealed lymph nodes in her underarm and above her collar bone that were “highly suspicious for metastatic disease.” The report also indicated “left hilar [lung]” activity that was “likely inflammatory.” The report recommended a biopsy and followup to correlate the findings. Dr. Reed had not reviewed a written report of the PET scan before meeting with plaintiff, but had admittedly relied solely on information she was given when she called for the test results. Dr. Reed first saw a written copy of the PET scan report on October 29, 2007, the same day that plaintiff came to her office, without an appointment, complaining of increased breast pain and demanding to know what the results of her PET scan were. It was then that Dr. Reed informed plaintiff, for the first time, that there were signs of possible metastasis, and she ordered that plaintiff undergo a second PET scan.
The second PET scan, performed November 7, 2007, showed a “progression of disease” and an “[increasing size and intensity of [the] right axillary and right, supraclavicular lymph nodes.” Additionally, whereas the April PET scan was equivocal and had shown inflammatory hilar activity in a region measuring approximately one centimeter, the November PET scan revealed a larger two centimeter apical density of the left lung. Dr. Reed referred plaintiff to a breast surgeon for a biopsy and to a pulmonologist for evaluation of the enlarged hilar lymph node. Plaintiff, however, opted for treatment with another physician and never returned to see Dr. Reed.
Defendants moved for summary judgment dismissing the complaint on the basis that plaintiff was unable to show a causal connection between her claimed injuries and the six-month delay in learning the results of the April 30, 2007 PET scan.
Defendants’ motion relied primarily on the 3V2-page affidavit of their expert, Dr. Grossbard, an oncologist. Without providing any statistical or empirical data to support his opinion, Dr. Grossbard stated that the delay in notifying plaintiff of the April 2007 positive PET scan results showing a recurrence of cancer and metastasis “was of no proximate cause whatsoever” and that it “did not deprive her of any opportunity for any treatment—be it surgery, chemotherapy or radiation” nor did it “change her life expectancy” or “[i]ncrease the statistical likelihood of further recurrence, as the cancer had already spread to the patient’s left lung as of the 4/30/07 study.”
In opposition to the motion, plaintiff provided the 3V2-page *441 affidavit of Dr. Levin, also an oncologist. He opined that Dr. Reed’s departure from accepted standards of care were substantial factors in causing the plaintiff pain and suffering, including increased breast pain, emotional trauma, unnecessary surgery to the lung, a reduced chance of recovery and the diminution of her life expectancy by 10% because the November 2007 PET scan showed “intense” activity in a “2 cm left lung apical density.” Plaintiff contrasted that result with the April 2007 PET scan study, which only showed “inflammatory” activity “in a region measuring approximately 1cm.”
In granting defendants’ motion, the court below accepted Dr. Grossbard’s opinion that “there were no viable treatment options for a cure available to plaintiff after the April 2007 study” although it was made without reference to any scientific or statistical studies and despite Dr. Reed’s own statement that it is her custom and practice to recommend, among other things, treatment with Tamoxifen if the PET scan is positive. However, in deciding that the plaintiff had failed to raise a triable issue of fact, the court ironically faulted Dr. Levin for providing an opinion that was “incomplete at best” and without any information regarding statistical probabilities.
Were the motion court’s criticism of plaintiffs expert’s affidavit accepted, it would hold equally for defendants’ expert. Both experts, however, have provided affidavits of equal strength, supported by the facts in the record, addressing the essential allegations in the bill of particulars and setting forth their opinions with a reasonable degree of medical certainty (Roques v Noble, 73 AD3d 204, 206 [1st Dept 2010]). Thus, although defendants met their initial burden of establishing their prima facie case, Dr. Levin’s affidavit established the requisite nexus between the malpractice allegedly committed by defendants and plaintiffs injury, thereby rebutting the defendants’ prima facie showing (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Mignoli v Oyugi, 82 AD3d 443 [1st Dept 2011]).
By deciding that defendants’ departure from accepted medical standards of practice “could not have caused plaintiff’s metastatic breast cancer, resulting physical and emotional pain or loss of a chance of cure,” the motion court erroneously decided a disputed issue of fact. Where oncological experts present competing opinions on causation, particularly about the progression of the disease, there is an issue of fact for a jury to decide (see Feldman v Levine, 90 AD3d 477 [1st Dept 2011], lv granted 18 NY3d 809 [2012]).
Dr. Grossbard’s opinion that “there were no viable treatment options to cure the plaintiff of her disease” (emphasis added) *442 ignores plaintiffs chief claim that, as a result of defendants’ negligence, she suffered the spread and advancement of the disease, pain and suffering, emotional trauma and a decreased life expectancy. Curing cancer, while an ultimate and worthy aspiration, is not the only positive treatment outcome. Whether a diagnostic delay affected a patient’s prognosis is typically an issue that should be presented to a jury (Meth v Gorfine, 34 AD3d 267 [1st Dept 2006]).
Nothing in plaintiffs medical record suggests that plaintiff could, not have benefitted from treatment or that the disease was at such an advanced stage that it was untreatable (compare Schaub v Cooper, 34 AD3d 268 [1st Dept 2006] [multiple metastatic lesions in the liver, condition inoperable, only 7% chance of survival]; Candia v Estepan, 289 AD2d 38 [1st Dept 2001] [incurable mesothelioma]). Since the report of the April 2007 PET scan only stated that there was “activity” in the “left hilar [lung]” and a followup was recommended, there is also a genuine material issue of fact as to whether Dr. Reed’s failure to send plaintiff for a biopsy sooner than November 2007 proximately caused plaintiff’s injuries which included the progression of the disease and lung surgery. Contrary to the dissent’s position, plaintiff is not foreclosed from claiming injury from the undisputed delay in treatment because the April 2007 PET scan already showed some evidence of cancer metastasises in her lung. Notably, plaintiff has alleged damages beyond unnecessary lung surgery. In any event, the experts’ disagreement on whether surgery would have been necessary in April 2007, based upon reading the same medical records, is sufficient to submit the issue to the jury.
Finally, although plaintiff had previously been prescribed Tamoxifen, but stopped taking it because of negative side effects, it is wholly speculative to say that “plaintiff did not wish to avail herself of hormone therapy” or would be uncooperative with that regimen had it been prescribed to her in connection with the recurrence of the disease.
Concur—Andrias, J.P, Friedman, Román and Gische, JJ.