■ MICHAEL NEYMAN, Individually and as Administrator of the Estate of OLENA NEYMAN, Deceased, Appellant, v DOSHI DIAGNOSTIC IMAGING SERVICES, P.C., et al., Respondents, et al., Defendant. [59 NYS3d 456]—

In a consolidated action to recover damages for medical malpractice, etc., the plaintiff appeals (1) from an order of the Supreme Court, Kings County (Schmidt, J.), dated November 20, 2014, which granted the separate motions of the defendants Doshi Diagnostic Imaging Services, P.C., and Leonid Sorkin, M.D., for summary judgment dismissing the complaint insofar as asserted against each of them, and (2), as limited by his brief, from so much of a judgment of the same court dated February 3, 2015, as, upon the order, dismissed the complaint insofar as asserted against those defendants.

Ordered that the appeal from the order is dismissed; and it is further,

Ordered that the judgment is modified, on the law, by deleting the provision thereof dismissing the complaint insofar as asserted against the defendant Leonid Sorkin, M.D.; as so modified, the judgment is affirmed insofar as appealed from, the motion of the defendant Leonid Sorkin, M.D., for summary judgment dismissing the complaint insofar as asserted against him is denied, the order dated November 20, 2014, is modified accordingly, and the complaint is reinstated against that defendant; and it is further,

Ordered that one bill of costs is awarded to the plaintiff, payable by the defendant Leonid Sorkin, M.D., and one bill of costs is awarded to the defendant Doshi Diagnostic Imaging Services, P.C., payable by the plaintiff.

The appeal from the intermediate order must be dismissed because the right of direct appeal therefrom terminated upon the entry of the judgment in the action (see Matter of Aho, 39 NY2d 241, 248 [1976]). The issues raised on the appeal from the order are brought up for review and have been considered on the appeal from the judgment (see CPLR 5501 [a] [1]).

In August 2004, the decedent Olena Neyman (hereinafter Olena) gave birth to a son. The defendant Leonid Sorkin, M.D., was Olena's obstetrician/gynecologist during that pregnancy. Olena breastfed her son for 13 months, until September 2005. Approximately one month after she stopped breastfeeding her son, Olena noticed a discharge from her left nipple that was "yellowish green," and "resembled" pus. This discharge was intermittent; often, weeks would pass before she observed the discharge again. Olena waited about five months to see a doctor, thinking that the discharge was normal and related to her prior breastfeeding.

On March 10, 2006, Olena presented to Sorkin, complaining about the discharge. In contrast to Olena's description of the discharge as resembling pus and coming from her left nipple only, Sorkin noted in Olena's chart that she complained of bilateral "milky" nipple discharge. Sorkin performed a breast examination and determined that Olena's breasts were symmetrical, noting there were no discrete masses or nipple retraction. Sorkin was able to express a sample of discharge from Olena's left breast, but not her right breast. The left breast discharge was sent for cytological screening. Sorkin prescribed Dostinex, a drug that blocks the hormone that stimulates milk production, and Naprosyn for pain. Sorkin also referred Olena for a bilateral breast sonogram to determine whether "there was any abnormality in the breast tissue outside of just discharge." Sorkin testified that, based upon his differential diagnosis, he "wanted to rule out anything more ominous," including the presence of any cancerous lesions. Sorkin instructed Olena to follow up in two to three weeks, and made a note to himself in her chart to "consider breast surgeon consult," which he testified would have been his course of action if the sonogram or cytology test was suspicious.

On March 14, 2006, Olena underwent a bilateral breast sonogram, which Joseph Dorsten, a physician employed by the defendant Doshi Diagnostic Imaging Services, P.C. (hereinafter Doshi), interpreted as negative for the presence of discrete solid or cystic masses, but noted that the "diagnostic value of [a] sonogram may be limited for a solid mass, which is isoechoic with surrounding breast tissue." The cytology sample, which Sorkin sent to a nonparty lab for testing, was interpreted as "Benign. No evidence of malignancy identified."

On April 7, 2006, Olena returned to Sorkin's office and informed him that a home pregnancy test was positive. The pregnancy was confirmed by an in-office test. Sorkin did not perform a breast examination on that date. Olena continued to

see Sorkin for prenatal care. At a routine office visit on April 27, 2006, Sorkin performed a breast examination that revealed no abnormalities.

On July 25, 2006, Olena presented with a palpable nodule in her left breast of one to two centimeters and complaints of bloody nipple discharge, prompting Sorkin to refer her to a breast surgeon, Leslie Strong. There was a notable delay in Olena seeing Strong, which was attributed to Olena's inability to obtain an appointment with Strong at an office location in Staten Island, where Olena lived.

On September 15, 2006, Olena presented to Strong, who examined her and was unable to palpate any nodules. Strong suspected fibrocystic disease, but wanted to rule out the presence of a tumor. At a follow-up visit on September 25, 2006, at which point Olena was 31 weeks into her pregnancy, Strong sent Olena for an emergency biopsy, which was positive for malignant cells indicative of "high grade carcinoma metastatic to the lymph nodes."

Also on September 25, 2006, Olena met with an oncologist, Maxim Kreditor, who determined in consultation with Sorkin that it would not be safe to deliver the baby until the pregnancy had reached 34 weeks and, therefore, it was not appropriate to begin chemotherapy at that time due to risks to the unborn child.

On October 6, 2006, Olena underwent both a mammogram and a sonogram which together revealed, inter alia, "asymmetric density on the superior left breast and innumerable suspicious diffuse clustered microcalcifications over a 12 x 12 cm area." On October 16, 2006, Olena underwent a mastectomy of the left breast. Subsequent testing revealed that the cancer had metastasized to other parts of Olena's body, including 5 of 23 lymph nodes. On October 25, 2006, Olena delivered her daughter by caesarian section. On October 30, 2006, a PET scan revealed a large destructive mass in Olena's right shoulder.

Olena's treatment consisted of, inter alia, near-weekly chemotherapy that continued over the next several years. On April 10, 2007, several months into chemotherapy, Olena underwent a PET/CT scan that is relevant to issues raised on appeal. According to the radiology report, the scan revealed that "[t]he previously noted increased hypermetabolic activity in the destructive lesion of the right scapula has resolved," that "[t]he previously noted discrete hypermetabolic foci throughout the skeleton have also resolved," and that "there is increased sclerosis in the majority of the bony metastases . . .

consistent with healing bony metastasis." Further, the radiologist noted "no new hypermetabolic activity to suggest new site of malignancy."

Despite these improvements, Olena's condition subsequently worsened and, on June 15, 2010, Olena died as a result of the cancer.

On or about April 14, 2009, Olena, and her husband, the plaintiff Michael Neyman (hereinafter the plaintiff), suing derivatively, commenced this action against Sorkin sounding in medical malpractice, which was consolidated with their separate action against Doshi. Upon Olena's death, the plaintiff was substituted in her place in his capacity as administrator of her estate. At the conclusion of discovery, Sorkin and Doshi separately moved for summary judgment dismissing the complaint insofar as asserted against each of them.

Sorkin's motion for summary judgment was supported by, inter alia, the expert affirmation of Mark A. Fialk, a physician board-certified in internal medicine with a subcertification in hematology and medical oncology. Fialk opined, with a reasonable degree of medical certainty, that Sorkin properly evaluated Olena's complaint of nipple discharge on March 10, 2006, and that, given her age and complaints, a sonogram and cytology were appropriate tests that were within the accepted standards of practice. Fialk also opined that, based upon the negative sonogram and cytology, and resolution of the discharge, "there is no evidence that breast cancer was present as of March 2006." Despite Fialk's opinion that no cancer was present on March 10, 2006, he alternatively opined that, if in fact cancer was present on that date, it was both microscopic and had already metastasized outside of the breast. His opinion that the cancer, if present, would have already metastasized by that date was premised upon a theory of "synchronous metastasis," which was based upon the similar sizes of the cancerous mass removed from Olena's left breast and the metastatic lesion observed in Olena's right shoulder on the October 30, 2006, PET scan. Thus, with respect to proximate cause, Fialk opined: "[A]ny alleged delay in diagnosing this cancer was not the proximate cause of injury to this patient. If the cancer was present and diagnosed in March, 2006, it would have been the same stage as it was in September and *the patient's treatment options and prognosis would have been the same as when the cancer was diagnosed in September, 2006"* (emphasis added).

Doshi's motion for summary judgment was supported by, inter alia, the affirmation of Ruth Rosenblatt, a board-certified

radiologist, who opined, with a reasonable degree of medical certainty, that Doshi did not deviate from the standard of care in interpreting the plaintiff's March 14, 2006, sonogram. Doshi also submitted the affirmation of Julia Smith, board-certified in internal medicine and oncology and a specialist in breast cancer, who opined that, had Olena's cancer been detected in mid-March 2006, there would have been no change in the staging of her cancer, her treatment, or her outcome.

In opposition to both motions, the plaintiff submitted, inter alia, the name-redacted affirmation of an expert physician, board certified in internal medicine with certified specialties in medical oncology and hospice palliative care medicine. The plaintiff's expert opined, with a reasonable degree of medical certainty, that Sorkin departed from the standard of care by failing to order a mammogram on March 10, 2006. The expert opined that, in light of the fact that Olena was no longer breastfeeding, the discharge from her left breast was a sign of left breast malignancy, warranting screening by mammogram. The plaintiff's expert noted that, on March 10, 2006, Sorkin was able to express discharge from Olena's left breast but was not able to physically palpate any lumps or lesions, and, therefore, in the expert's opinion, on that date, the cancerous lesions were less than one centimeter in size. The expert opined that a mammogram, which is capable of detecting breast tumors as small as .2 centimeters, more likely than not, would have been able to detect the presence of cancerous lesions. The expert opined that Olena's tumor was "fast growing" with a "relatively short doubling time," and that "[d]elays in diagnosis when dealing with a fast growing tumor such as the tumor that affected Olena Neyman, are quite significant in negatively impacting the patient[']s outcome." The expert opined that, in March of 2006, based upon the size of the lesions, the decedent's cancer was at most stage one or stage two, and that the failure to diagnose the cancer on that date proximately caused Olena to lose the chance for a better outcome, including the elimination of the cancer through excision and chemotherapy. The expert noted: "Further proof that early diagnosis and treatment would more likely than not have positively impacted upon the disease course and possible survival of [Olena] can be extrapolated by her positive response to her chemotherapy which extended her life, despite numerous bony metastases which were present at diagnosis, for over two years and seven months after her tumor diagnosis and mastectomy." The expert opined that, even if "metastatic disease was present in at least a microscopic extent seven months prior to the diagnosis when the patient presented with nipple discharge, it is medically

more probable than not that the excellent response of the wide-spread metastatic disease at the time of diagnosis to chemo-therapy to the point where she was in a complete remission based on the findings reported on the PET/CT scan of 4/10/2007 would indicate that had the chemotherapy been given to Ms. Neyman seven months earlier, the much smaller amount of metastatic disease would have been completely eliminated to the point that it would be more probable than not that she would have been cured and the immense suffering of the continuing cancer therapy and eventual progression of the cancer would have been avoided."

Additionally, the plaintiff submitted the name-redacted affirmation of a board-certified radiologist, who opined that, while the films from Olena's March 14, 2006, sonogram were "unremarkable," Doshi departed from the standard of care in failing to contact Sorkin and request that a mammogram also be ordered to accompany the sonogram.

The Supreme Court granted the separate motions of Doshi and Sorkin for summary judgment dismissing the complaint insofar as asserted against each of them. Although the court determined that the plaintiff's expert raised a triable issue of fact as to whether Sorkin's failure to order a mammogram on March 10, 2006, constituted a deviation from the standard of care, the court found that the plaintiff failed to raise a triable issue of fact as to whether that alleged deviation proximately caused Olena's injury, finding that the plaintiff's expert failed to rebut the opinion of Sorkin's expert that, "in March of 2006, [Olena's cancer] . . . was *incurable*" (emphasis added). The plaintiff appeals.

In an action to recover damages for medical malpractice, "a defendant physician seeking summary judgment must make a prima facie showing that there was no departure from good and accepted medical practice or that the plaintiff was not injured thereby" (*Stukas v Streiter*, 83 AD3d 18, 24 [2011]). Once the defendant has made such a showing, the plaintiff, in opposition, must submit sufficient evidentiary facts or materials to rebut the defendant's prima facie showing, but only as to those elements on which the defendant met the prima facie burden (*see id.* at 25; *Elmes v Yelon*, 140 AD3d 1009, 1010 [2016]).

Here, Sorkin met his prima facie burden for summary judgment dismissing the complaint insofar as asserted against him through the opinion of his expert, Fialk, who opined that, based upon Olena's signs and symptoms, ordering a sonogram and cytology were the medically appropriate tests to rule out can-

cer on March 10, 2006, and, therefore, Sorkin did not deviate from the standard of care (see *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]). However, in opposition, the plaintiff raised a triable issue of fact through his expert's affirmation opining that, based upon Olena's signs and symptoms of left nipple discharge continuing after she had stopped breastfeeding, the standard of care required ordering a mammogram in addition to a sonogram. The plaintiff's expert based this opinion on, inter alia, a mammogram's ability to detect lesions as small as .2 centimeters, which are otherwise not detectable through palpation. The foregoing opinion was sufficient to raise a triable issue of fact as to whether Sorkin's failure to order a mammogram was a departure from the standard of care (see *Abbatantuono v Boolbol*, 115 AD3d 892, 893 [2014]).

With respect to the issue of proximate cause, Sorkin's expert, Fialk, essentially offered alternative opinions. First, Fialk opined that there was no evidence that the cancer was present in March 2006, based upon the negative studies, i.e., the sonogram and cytology, and the resolution of Olena's complaint of nipple discharge. Under this theory, even if the failure to order a mammogram based upon Olena's symptoms and complaints was a departure from the standard of care, there was no cancer present to be diagnosed. This opinion was sufficient for Sorkin to meet his prima facie burden on the issue of proximate cause, shifting the burden to the plaintiff to raise a triable issue of fact (see *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]). However, in opposition, the plaintiff raised a triable issue of fact through his expert oncologist's detailed opinion that Olena's left breast discharge was a sign of malignancy, that the cancer was present in March 2006, and that it would have been detectable by a mammogram. The expert also opined that, in March 2006, the cancer was at most stage one or stage two, and could have been eliminated through excision and chemotherapy. Where, as here, oncological experts present competing opinions on causation, particularly about the progression of the disease, there is a triable issue of fact for a jury to decide (see *Polanco v Reed*, 105 AD3d 438, 441 [2013]).

Fialk also offered, in the alternative, a second opinion on the issue of proximate cause. In contrast to his primary opinion that the cancer was not present in March 2006, Fialk opined that, if the cancer was in fact present in March 2006, Olena's "treatment options and prognosis would have been the same as when the cancer was diagnosed in September, 2006." Fialk did not discuss or offer any details with respect to his claim that

Olena's treatment options and prognosis would have been the same had microscopic metastatic cancer been diagnosed seven months before it grew to the large destructive masses discovered in September and October 2006. Indeed, given the rapid medical response to Olena's diagnosis, which included performing a mastectomy on October 16, 2006, only weeks after her diagnosis and before she gave birth to her daughter by caesarian section on October 25, 2006, Fialk's opinion that Olena's available courses of treatment would have been the same in both March 2006 and September 2006, was speculative. The records of Kreditor, Olena's treating oncologist, are clear that, because of the stage of her pregnancy at the time of diagnosis, Olena's treatment options were limited. Fialk's alternative opinion was conclusory and speculative, and therefore, insufficient to independently establish Sorkin's prima facie burden for summary judgment.

In any event, in opposition, the plaintiff raised a triable issue of fact. "In a medical malpractice action, where causation is often a difficult issue, a plaintiff need do no more than offer sufficient evidence from which a reasonable person might conclude that it was more probable than not that the injury was caused by the defendant" (*Holton v Sprain Brook Manor Nursing Home*, 253 AD2d 852, 852 [1998]; *see Goldberg v Horowitz*, 73 AD3d 691, 694 [2010]). "As to causation, the plaintiff's evidence may be deemed legally sufficient *even if its expert cannot quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased his injury,* as long as evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased his injury" (*Flaherty v Fromberg*, 46 AD3d 743, 745 [2007] [emphasis added]; *see Goldberg v Horowitz*, 73 AD3d 691, 694 [2010]; *Alicea v Ligouri*, 54 AD3d 784, 786 [2008]; *Jump v Facelle*, 275 AD2d 345, 346 [2000]). Here, while the plaintiff's expert's primary opinion was that Olena's cancer was at most, stage one or two in March 2006, the expert also addressed, in the alternative, the scenario postulated by Fialk, under which the cancer had already metastasized to other parts of Olena's body by March 2006. Noting Olena's documented positive response to chemotherapy, as evidenced by the results of the April 10, 2007, PET/CT scan, which showed that the chemotherapy successfully, although briefly, put the cancer into remission, the plaintiff's expert opined that, even if metastatic disease was present in March 2006, the intervention of chemotherapy at that time would have successfully treated the much smaller amount of metastatic disease. Thus, in the expert's opinion,

had chemotherapy been instituted earlier, Olena's chances for recovery, or at least for prolonging her life and reducing her suffering, were substantially improved. This is the type of detailed expert opinion from which a jury could conclude that Sorkin's conduct, if found to have constituted a departure from the standard of care, diminished Olena's chance of a better outcome or increased her injury (*see Flaherty v Fromberg*, 46 AD3d at 745; *see also Goldberg v Horowitz*, 73 AD3d at 694; *Alicea v Ligouri*, 54 AD3d at 786). To raise a triable issue of fact, a plaintiff need not establish that, but for a defendant doctor's failure to diagnose, the patient would have been cured. "Curing cancer, while an ultimate and worthy aspiration, is not the only positive treatment outcome. Whether a diagnostic delay affected a patient's prognosis is typically an issue that should be presented to a jury" (*Polanco v Reed*, 105 AD3d 438, 442 [2013]). Accordingly, Sorkin's motion for summary judgment dismissing the complaint insofar as asserted against him should have been denied.

The Supreme Court, however, properly granted Doshi's motion for summary judgment dismissing the complaint insofar as asserted against it. Doshi met its prima facie burden for summary judgment by establishing that it only assumed a limited duty of care in performing and interpreting the sonogram of Olena's left breast. " 'Although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken by the physician and relied on by the patient' " (*Dockery v Sprecher*, 68 AD3d 1043, 1046 [2009], quoting *Chulla v DiStefano*, 242 AD2d 657, 658 [1997]; *see Markley v Albany Med. Ctr. Hosp.*, 163 AD2d 639, 640 [1990]). In this case, Sorkin was the decedent's treating physician, and the scope of care provided by the radiologists at Doshi was limited to performing the sonogram, interpreting the sonogram film, and documenting their findings. The sonogram was, as the plaintiff's expert radiologist concedes, "unremarkable," and neither Doshi nor Dorsten, its employee, assumed a general duty of care to schedule further testing or independently diagnose Olena's medical condition (*see Mosezhnik v Berenstein*, 33 AD3d 895, 897 [2006]; *Wasserman v Staten Is. Radiological Assoc.*, 2 AD3d 713, 714 [2003]). Doshi also included a limited caution on its sonogram report indicating that the diagnostic value of the sonogram may be limited for the detection of a solid mass. In opposition to Doshi's prima facie showing, the plaintiff failed to raise a triable issue of fact (*see Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]). Accordingly, the Supreme Court properly granted Doshi's motion for summary judgment dismissing the complaint insofar

as asserted against it. Dillon, J.P., Balkin, Austin and Connolly, JJ., concur.