| Gray v Vogel |
|:---:|
| 2024 NY Slip Op 30035(U) |
| January 4, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 511364/14 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 80 of the Supreme
Court of the State of New York, held in and
for the County of Kings, at the Courthouse,
at Civic Center, Brooklyn, New York, on the
4th day of January 2024.

P R E S E N T :

HON. GENINE D. EDWARDS,

Justice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ANN MARIE GRAY as Administratrix of the Estate of
MICHAEL BRYAN, and ANN MARIE GRAY, Individually,

Plaintiffs,

- against -

SARAH VOGEL, M.D.,
JESSICA LAROSSA, P.A.,
STEPHEN HUGHES, M.D., and
ALBANY MEMORIAL HOSPITAL,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**DECISION AND ORDER**

Index No. 511364/14

Mot. Seq. Nos. 4-7

The following e-filed papers read herein:                NYSCEF Doc No.:

Notice of Motion/Cross Motion, Affirmations,
  and Exhibits.................................... 158-173; 174-192; 193-217; 228-245
Affirmations in Opposition and Exhibits ............. 246-247; 248-249; 250-251; 253-256
Reply Affirmations and Exhibits ..................... 257-260; 261; 262; 264-265

In this action to recover damages for (among other things) medical malpractice and

wrongful death, defendants Sarah Vogel, M.D. ("Dr. Vogel") and Jessica LaRossa, P.A.

("PA LaRossa"), jointly, and defendants Stephen Hughes, M.D. ("Dr. Hughes") and Albany

Memorial Hospital ("AMH") separately, move for summary judgment dismissing all claims

as against each such defendant, whereas plaintiff Ann Marie Gray, individually and as the

administratrix of the estate of her late son, Michael Bryan (collectively, "plaintiff"), cross-

moves for partial summary judgment on the issue of liability as against defendants

Dr. Hughes and AMH (motion sequence numbers 5, 4, 6, and 7, respectively).

## Background

In the early afternoon of Sunday, February 10, 2013,[1] Michael Bryan (the "patient"), an uninsured (or "self-pay") dishwasher, age 25, presented to AMH's emergency room ("ER") with the complaint of "ankle pain and right calf pain [and swelling] for several weeks" (AMH's records at 088).[2] The patient reported at triage that: (1) "he [had] injured [his right ankle] a couple of years ago";[3] (2) "he ha[d] a job where he [was] on his feet all the time"; (3) "[h]e's had increased pain [in his *right ankle*] for the past couple of days"; and (4) "[h]e also ha[d] some pain in his *right* proximal *calf* laterally" (*Id.* at 087, 092) (italics added; capitalization omitted). The patient reported that his pain level was 10 (on the scale of 1 to 10, with 10 being the highest) (*Id.* at 094, 096). His medical history was significant for asthma for which he visited AMH's ER one month prior on January 15 and for which he was prescribed an Albuterol inhaler by PA LaRossa (*Id.* at 115, 117, 119-120).

A physical examination of the patient by Dr. Vogel, an emergency room physician then overseeing the triage, found that he was suffering from a "mild diffuse tenderness to palpation around the *right ankle* joint," together with a "[m]ild tenderness on his *right* lateral *calf* proximally" (*Id.* at 087) (italics added). An X-ray of the patient's right ankle was ordered by Dr. Vogel to confirm an "acute exacerbation of an old injury of his right

---

[1] All references are to calendar year 2013, unless otherwise indicated.

[2] The patient's complaint was alternatively described as "*increasing* pain for the past several weeks"; "pain in the *knee* and his ankle[,] and . . . pain in his calf"; and "pain when he *walks* on [his right] leg" (AMH's records at page 088) (emphasis added).

[3] Approximately three years prior, on April 16, 2010, the patient presented to AMH, complaining of a right-ankle injury and explaining that he "slipped and fell down 10 [steps of] stairs this [morning;] denie[d] loss of consciousness or other injury" (AMH's records at 028 [abbreviations spelled out]). No fracture or dislocation was found on the X-ray examination (*id.* at 035). On discharge later the same day (April 16, 2010), the patient was given a right-ankle brace, crutches, and two tablets of (together with a prescription for) Hydrocodone/APAP 5/325 (*id.* at 027, 030, and 031).

2

[* 2]

ankle" (*Id.* at 087). This was consistent with the triage nurse's prior assessment of the patient as suffering from an "ankle injury" or "ankle sprain" (*Id.* at 080 and 084). The right-ankle X-ray found "no evidence of acute fracture, dislocation or focal soft tissue swelling" (*Id.* at 089).

After the X-ray was performed, the patient was transferred to the low risk, "Fast Track" section of the ER, which was then overseen by PA LaRossa. A physical examination of the patient by PA LaRossa was significant for "[t]enderness to palpation over the anterior [right] ankle" and was "+ [positive for] [right] calf tenderness" (AMH's records at 089). Following her examination of the patient, PA LaRossa ordered an ultrasound study of the patient's right leg to rule out DVT (*Id.* at 099).

Later, on the afternoon of February 10th, the patient underwent a diagnostic ultrasound study of his right leg starting at his right groin and ending at his right ankle, with the relevant medical history of "[right] leg swelling" (the "sonogram") (AMH's records at 076 and 102). The sonogram was performed by nonparty Registered Diagnostic Medical Sonographer/Registered Vascular Technologist Justine Levesque.[4] The resulting sonogram films (as static images) were interpreted by radiologist Dr. Hughes.[5] Dr. Hughes's ultrasonographic *findings* were that: (1) the patient's "deep venous system of [his] right leg was visualized from the level of the common femoral vein ["CFV"] to the popliteal vein";[6] (2) "[t]he vessels demonstrated anechoic [echo-free] lumen and normal compressibility,

---

[4] *See* Affidavit of Justine Levesque, dated June 17, 2022 (NYSCEF Doc No. 104), ¶ 4.

[5] *See* Dr. Hughes' deposition tr at page 22, lines 2-4.

[6] The common femoral vein (or "CFV" for short) is anatomically located at the groin level (*see* Dr. Hughes' deposition tr at page 27, lines 10-11).

3

[* 3]

*with no evidence of [DVT]*; and (3) "[d]uplex evaluation demonstrates intact venous flow" (*Id.* at 102) (italics added). Dr. Hughes' *impression* of the sonogram as a diagnostic radiologist was: *"[n]o sonographic evidence of DVT, right leg, from the level of the [CFV] through the popliteal trifurcation"* (*Id.* at 102) (italics added).

Following Dr. Hughes' negative interpretation of the sonogram, the patient received, in the ER, an ankle splint, an ice/cold pack, a set of crutches, and a prescription for three-times-daily Ibuprofen (AMH's records at 083, 085, 089, 091, and 103). In the late afternoon of the same day, he was sent home on a "routine discharge" in "stable condition" with the written instructions of "Rest, Ice, Compress, Elevate, Us[e] Crutches. Joint Pain" (*Id.* at 086, 090, and 091). The patient was orally advised (according to PA LaRossa's note) "to follow up with orthopedics for [a] further evaluation" or to return to AMH's emergency room (*Id.* at 089).[7] He did not follow up either with orthopedics nor a primary care physician because he did not have health insurance.[8] Nor did he return to AMH's emergency room.

Nineteen days later, on the evening of March 1st, the patient, while relaxing at a friend's home, suffered a series of cardiac arrests known as "pulseless electrical activity" ("PEA"). Prior to experiencing those arrests, the patient "had been complaining [for] approximately two weeks of respiratory symptoms, cough, and difficulty breathing," and on February 28th (the day before the PEAs), "he [had] developed right leg pain, which

---

[7] Whereas the patient's medical chart included a referral to "Northeast Orthopedics" for the "First Available Appoint[ment]" (at page 099), it stated elsewhere that the patient was to follow up with his primary care physician, rather than with an orthopedist (at page 097).

[8] *See* Shaquanna Woods' deposition tr at page 22, lines 2-5; page 24, line 8 to 18; page 25, lines 7-19.

4

[* 4]

continued overnight and worsened throughout the course of the day."[9]  Following the PEAs, he was immediately taken to nonparty Albany Medical Center Hospital where he was diagnosed with pulmonary embolism ("PE").[10]  He died there on March 12th, leaving his mother and brother as the surviving next of kin.  The immediate cause of his death was the "anoxic brain injury" due to (or as a consequence of) the "pulmonary embolus [*i.e.,* the PE]."[11]

On December 2, 2014, the patient's mother (acting individually and as the administratrix of his estate) commenced the instant action asserting claims sounding in medical malpractice, wrongful death, loss of services, vicarious liability, and lack of informed consent as against all defendants, and an additional, separate cause of action for negligent retention and credentialing as against AMH.  Each defendant joined issue.  After discovery was completed, an amended note of issue/certificate of readiness was filed on November 4, 2022.  Thereafter, the time to move for summary judgment was extended via so-ordered stipulation, dated December 13, 2022 (Graham, J.) (NYSCEF Doc No. 181).  The instant motions and cross-motion were each timely served in accordance with the terms of the aforementioned stipulation.  On September 22, 2023, the motions and cross-motion were deemed fully submitted, with the Court reserving decision.

Dismissal of certain groups of plaintiff's claims was unopposed.  First, plaintiff failed to oppose the entirety of the joint motion of Dr. Vogel and PA LaRossa for dismissal

---

[9] *See* Albany Medical Center Hospital, March 1st ER physician's note (NYSCEF Doc No. 50).

[10] With the exception of the March 1st ER physician's note and the March 12th Certificate of Death, the patient's chart with Albany Medical Center Hospital is not part of the court record.  Albany Medical Center Hospital is not the same as AMH.  *See Lasher v. Albany Mem. Hosp.*, 161 A.D.3d 1326, 77 N.Y.S.3d 544 (3d Dept., 2018).

[11] *See* Certificate of Death (NYCEF Doc No. 243).

[* 5]

of all her claims as against them. Second, plaintiff failed to oppose the branches of Dr. Hughes' and AMH's separate motions for dismissal of her informed-consent claim. Third and finally, plaintiff failed to oppose the branch of AMH's motion for dismissal of her claim for negligent retention and credentialing as against AMH. Accordingly, all such claims are dismissed without further discussion, as more fully set forth in the decretal paragraphs below. The balance of this Decision and Order addresses the merits of plaintiff's remaining claims as against Dr. Hughes and AMH, which are comprised of: (1) the medical malpractice, wrongful death, and loss of services claims as against Dr. Hughes, as predicated on his alleged failure to properly read and interpret the patient's sonogram,[12] and (2) the vicarious liability claim as against AMH for such alleged failure.

## Discussion

Dr. Hughes (and, by extension, AMH) established, prima facie, that he discharged his duty to the patient in accordance with accepted practice for radiologists. *See Mann v. Okere*, 195 A.D.3d 910, 150 N.Y.S.3d 306 (2d Dept., 2021); *Meade v. Yland*, 140 A.D.3d 931, 33 N.Y.S.3d 444 (2d Dept., 2016). Jonathan Luchs, M.D., the radiology expert for Dr. Hughes (as well as for AMH[13]) (the "radiology defense expert"), concluded (in ¶¶ 16 and 22-23 of his opening affirmation at NYSCEF Doc No. 173) that: (1) Dr. Hughes'

---

[12] Plaintiff effectively abandoned the remaining predicates for her medical malpractice, wrongful death, and loss of services claims as against Dr. Hughes (and vicariously as against AMH), by failing to address them in the affirmation of her expert radiologist. The remaining predicates consisted of the alleged failure to timely and properly perform: (1) a sonogram of the patient's veins below his right knee; (2) a VQ scan of his veins below his right knee; (3) a CT angiogram; and (4) an MRI. *See Garbowski v. Hudson Val. Hosp. Ctr.*, 85 A.D.3d 724, 924 N.Y.S.2d 567 (2d Dept., 2011).

[13] *See* AMH's Affirmation in Support, dated May 2, 2023 (NYSCEF Doc No. 194), ¶ 5 ("[AMH] hereby adopts and incorporates by reference the opinions set forth in the affirmations of Board-Certified radiologist Dr. Jonathan Luchs").

interpretation of the sonogram was in conformity with accepted practices; (2) the "[i]maging of the lower [right] calf was demonstrated on the [sonogram] and did not show any clots"; and (3) he agreed with Dr. Hughes' opinion of "*[n]o sonographic evidence of DVT, right leg, from the level of the [CFV]*" (italics added).[14]   The radiology defense expert further opined (in ¶ 28 of his opening affirmation) that "the progression of [the patient's] [PE] and his subsequent death on March 12 . . . [could not] be attributed in any way to the care provided by Dr. Hughes on February 10."

## (1)

In opposition to Dr. Hughes' prima facie showing, plaintiff raised triable issues of fact – by way of the affirmations of radiologist Jordan Haber, M.D., at NYSCEF Doc No. 242 (the "plaintiff's radiology expert"), and her emergency-medicine physician David Mark Nidorf, M.D., at NYSCEF Doc No. 244 (the "plaintiff's emergency-physician expert) – as to whether Dr. Hughes departed from good and accepted radiological practice in failing to properly read and interpret the patient's sonogram, and whether such departure caused the

---

[14] The aforecited italicized language represented only a portion of Dr. Hughes' impression of "*[n]o sonographic evidence of DVT, right leg, from the level of the [CFV]* through the popliteal trifurcation."   Significantly, however, the radiology defense expert did *not* opine in ¶¶ 22-23 of his opening affirmation that he agreed with the *entirety* of Dr. Hughes' impression which, in addition to the italicized language above, included the underlined language which the radiology defense expert omitted in his opening affirmation.   Rather, the radiology defense expert finessed the remainder of Dr. Hughes' impression by focusing on the vein *compressibility* which (as explained more fully in the text below) was only one, but not the only, criterion for ruling out the presence of a clot.   *See* Radiology Defense Expert's Opening Affirmation, ¶ 23 ("All relevant portions of the leg, including the lower extremity[,] [were] *compressed* [with the probe] during the ultrasound to identify an acute clot.   Each image showed a clear view of the . . . vein before and after *compression* [with the probe].   In each of these views[,] the vein flattened out and demonstrated full *compression* of the vein indicating no clot" [italics added]).

[* 7]

patient's PE and his subsequent death. *See Ivey v. Mbaidjol*, 202 A.D.3d 1070, 163 N.Y.S.3d 589 (2d Dept., 2022). It is hornbook law that "[s]ummary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. . . [because] [s]uch credibility issues can only be resolved by a jury." *Feinberg v. Feit*, 23 A.D.3d 517, 806 N.Y.S.2d 661 (2d Dept., 2005).

On the subject of proximate cause, her emergency-physician expert elaborated (in ¶ 11 of his affirmation) that: (1) "[t]he available treatment for a DVT . . . include[d] anticoagulation therapy, [the placement of] a [G]reenfield filter, or an embolectomy"; (2) "[h]ad the diagnosis been made on February 10 . . . , the [patient] would have been treated using one or more of the above[-]reference[d] methods"; and (3) with timely treatment, the patient "would not have suffered [PE], . . . an anoxic brain injury, and . . . death . . . that occurred as a result of the [missed] DVT." To raise a triable issue of fact, "a plaintiff need not establish that, but for a defendant doctor's failure to diagnose, the patient would have been cured." *Neyman v. Doshi Diagnostic Imaging Serv., P.C.*, 153 A.D.3d 538, 59 N.Y.S.3d 456 (2d Dept., 2017). "Whether a diagnostic delay affected a patient's prognosis is typically an issue that should be presented to a jury." *Id.* (internal quotation marks omitted).

Contrary to AMH's contention, the patient's non-compliance with the discharge instructions in failing to follow up with an orthopedist or a primary care physician (or to return to the ER) did not constitute an intervening cause that, as a matter of law, severed the causal nexus between the missed DVT and the patient's injuries/death. "When a question

8

of proximate cause involves an intervening act, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Hain v. Jamison*, 28 N.Y.3d 524, 46 N.Y.S.3d 502 (2016) (internal quotation marks and italics omitted). Nothing in the radiology defense expert's affirmations (at NYSCEF Doc Nos. 173 and 256) supported (much less established as a matter of law) that the patient's failure to follow up was "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from [Dr. Hughes'] conduct, that it [might] possibly break the causal nexus." *Romanelli v. Jones*, 179 A.D.3d 851, 117 N.Y.S.3d 90 (2d Dept., 2020) (internal quotation marks omitted).

**(2)**

The radiology defense expert's contention, in his separate affirmation in opposition to plaintiff's motion (at NYSCEF Doc No. 256), that the plaintiff's radiology expert relied (in essence) on falsehoods and manufactured evidence in rendering an opinion, was unsupportable, both medically and legally. The plaintiff's radiology expert's opinions were grounded in the medical evidence on both the *macro* and *micro* levels.

On the *macro* level of analysis of the medical evidence, the plaintiff's expert radiologist opined (in ¶¶ 8 and 15 of his affirmation) that:

(1) The sonogram "demonstrate[d] the presence of a clot in the patient's right [CFV], which was missed by [Dr.] Hughes";

9

[* 9]

(2) "[Dr.] Hughes should have diagnosed the DVT on the patient's . . . sonogram, and that [his] failure to diagnose the DVT [was] a violation of the standard of care"; and

(3) "Had [Dr.] Hughes made the diagnosis of a DVT on February 10 . . . , a number of procedures were available to treat the patient's condition that would have prevented the DVT from dislodging, . . . traveling to the patient's lungs, and causing the [PE], the patient's anoxia and [PEA episodes] on March 1 . . . and death on March 12."

Turning to the *micro* level of analysis of the medical evidence, the plaintiff's expert radiologist further opined (in ¶¶ 8-13 of his affirmation) that:

(1) The DVT was present in the patient's right leg, and could be seen (or visualized), "on at least three . . . separate sonographic images identified as: 2/29, 24/2[9] and 25/29";

(2) "Image 2 of 29 [showed] . . . that [the lumen of] the [patient's] right [CFV] did not compress [with the probe] during the [sonographic] examination";

(3) Images of the right CFV "demonstrate[d] the presence of echogenic material which, in fact, represent[ed] a DVT (blood clot) in the patient[']s right [leg]"; and

(4) The "DVT [was] also present on [each of] additional [I]mages 24/29 and 25/29."

Moreover, the plaintiff's expert radiologist (in ¶¶ 10-12 of his affirmation) proffered a medical illustration as a representation of a visible clot (*i.e.*, the patient's right-sided DVT) on each of the Images 2/29, 24/29, and 25/29. *See* Medical Illustration, pages 1-2, at NYSCEF Doc No. 235.

10

[* 10]

**(3)**

The radiology defense expert's disagreement with the plaintiff's expert radiologist on the interpretation of the sonogram films was at odds with several radiological principles. First, a blood clot could be both complete and occlusive or, alternatively, partial and obstructive; meaning that the patient could still have had a blood clot in the lumen of his right CFV (or in the lumen of any other deep vein in his right leg), notwithstanding the presence of blood flow in his right leg.[15] Second, the echogenicity of the patient's deep veins in his right leg must be separately (and ultrasonographically) assessed, in addition to (and aside from) the blood flow therein.[16] Third, the ultrasound technologist's *compression* with her probe[17] of the patient's deep veins in his right leg was not equivalent (in terms of the assessment of the patient's blood flow) to her *augmentation* of his blood flow by her squeezing of his right calf.

**(4)**

Finally and fundamentally (and apart from the foregoing), the radiology defense expert's disagreement with plaintiff's expert radiologist on the sonogram interpretation

---

[15] *See* Dr. Hughes' deposition tr at page 47, lines 3-8 (testifying that clots or "thrombosis" can vary in size).

[16] *See* Dr. Hughes' deposition tr at page 22, line 14 to page 23, line 3 ("There are different components to the Doppler ultrasound exam. . . . The transducer is placed over the blood vessels and those images are displayed in black and white and then they [the performing technologist] physically interrogate the blood vessel, *so they look at it and they see if they can compress it. And then . . . the Doppler portion of the examination is actually where you use the sound waves to look at the blood flow and that's in color.* . . . In the first portion[,] you'd see . . . materials, some echo[e]s. Generally the inside of a blood vessel is black and there would be some echo[e]s inside . . . And then the blood vessel itself is not compressible, the vein cannot be compressed because there is something occupying the blood vessel."); page 42, lines 2-3 ("[W]hen you're using the *Doppler*, you're literally *listening* to the blood flow.") (italics added in each instance).

[17] *See* Dr. Hughes' deposition tr at page 22, line 19; page 43, line 3; page 50, line 4.

11

presented an issue of fact for the jury to resolve. As Dr. Hughes noted (at page 23, line 18 of his deposition), "[i]t . . . takes a skilled person to see [the abnormalities on the sonogram]." It was not the Court's function on summary judgment to interpret ultrasonographic images, particularly where (as more fully set forth in the margin), the parties' respective experts disagreed as to whether *every* image on the sonogram was properly taken.[18] *See Ivey v. Mbaidjol*, 202 A.D.3d 1070, 163 N.Y.S.3d 589 (2d Dept., 2022); *Matos v. Khan*, 119 A.D.3d 909, 991 N.Y.S.2d 83 (2d Dept., 2014).[19]

"Additionally, because the cause[s] of action alleging wrongful death [and loss of services] [were] premised on the defendant's alleged medical malpractice, the same conclusions apply as to [such] cause[s] of action." *Matos v. Khan*, 119 A.D.3d 909, 991 N.Y.S.2d 83 (2d Dept., 2014).

Next, by establishing the existence of triable issues of fact regarding the liability of Dr. Hughes (as predicated on his alleged failure to properly read and interpret the patient's sonogram), plaintiff also raised triable issues of fact regarding the vicarious liability of AMH in that regard. *See Vichlenski v. Schwartz*, 201 A.D.3d 773, 161 N.Y.S.3d 293 (2d Dept., 2022); *Goffredo v. St. Luke's Cornwall Hosp.*, 194 A.D.3d 699, 143 N.Y.S.3d 597 (2d Dept., 2021). Finally, the existence of triable issues of fact as to Dr. Hughes'

---

[18] Whereas the radiology defense expert opined (in ¶ 5 of his affirmation in opposition) that Image 25/29 was "a poor image of the Doppler being applied at a *bad* angle" and that "the angle of the probe was *improper*," Dr. Hughes testified (at page 25, lines 15-16 of his deposition) that "the images were *all done very well*" (italics added).

[19] *See also Carroll v. Niagara Falls Mem. Med. Ctr.*, 218 A.D.3d 1373, 193 N.Y.S.3d 579 (4th Dept., 2023) ("Contrary to the Perry defendants' contention, we conclude that the affidavit of plaintiff's expert raised triable issues of fact with respect to plaintiff's theory that Dr. Perry's failure to identify a DVT on the ultrasound constituted medical malpractice. *In contrast to the opinion of [defendant] Dr. Perry that the ultrasound images showed no evidence of a DVT, plaintiff's expert opined that the black lentiform area on at least one image showed 'a classic sign of DVT/blood clot.' Thus, the affidavit of plaintiff's expert squarely contradicted Dr. Perry's affidavit and created a classic battle of the experts on the element of deviation that is properly left to a jury for resolution.*") (italics added).

12

[* 12]

alleged failure to properly read and interpret the patient's sonogram precluded the grant of partial summary judgment on the issue of liability in plaintiff's favor.

## Conclusion

Accordingly, it is

**ORDERED** that in motion Seq. No. 5, Dr. Vogel and PA LaRossa's joint motion for summary judgment dismissing all claims as against them is *granted without opposition*; the complaint is dismissed as against Dr. Vogel and PA LaRossa without costs or disbursements; and the action is severed and continued as against the remaining defendants, Dr. Hughes and AMH, and it is further

**ORDERED** that in motion Seq. No. 4, Dr. Hughes' motion is *granted to the extent* that: (1) plaintiff's medical malpractice, wrongful death, and loss of services claims, insofar as *not* predicated, in each instance, on his alleged failure to properly read and interpret the patient's sonogram, are dismissed as against him; and (2) her informed-consent claim is dismissed as against him; and the remainder of his motion is denied, and it is further

**ORDERED** that in motion Seq. No. 6, AMH's motion is *granted to the extent* that: (1) plaintiff's vicarious liability claim, as predicated on the alleged acts/omissions of Dr. Vogel and Pa LaRossa, are dismissed as against it; (2) her vicarious liability claim, insofar as *not* predicated on Dr. Hughes' alleged failure to properly read and interpret the patient's sonogram, is dismissed as against it; (3) her informed-consent claim is dismissed as against it; and (4) her negligent retention and credentialing claim is dismissed as against it; and the remainder of its motion is denied, and it is further

**ORDERED** that in motion Seq. No. 7, plaintiff's motion for partial summary judgment on the issue of liability as against Dr. Hughes and AMH is *denied in its entirety*, and it is further

**ORDERED** that, for the avoidance of doubt, the action shall proceed on plaintiff's medical malpractice, wrongful death, and loss of services claims as against Dr. Hughes, and

13

[*13]

on her vicarious liability claim as against AMH, *insofar as predicated, in each instance, on Dr. Hughes' alleged failure to properly read and interpret the patient's sonogram,* and it is further

      **ORDERED** that to reflect the dismissal of Dr. Vogel and PA LaRossa from this action, the caption is amended to read as follows:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ANN MARIE GRAY as Administratrix of the Estate of
MICHAEL BRYAN, and ANN MARIE GRAY, Individually,

                Plaintiffs,

       - against -                            Index No. 511364/14

STEPHEN HUGHES, M.D., and
ALBANY MEMORIAL HOSPITAL,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

      and it is further

      **ORDERED** that plaintiff's counsel is directed to electronically serve a copy of this Decision and Order with notice of entry on defendants' respective counsel and to electronically file an affidavit of service with the Kings County Clerk.

      This constitutes the Decision and Order of the Court.



ENTER,

Genine D. Edwards
J. S. C.

14