Evans v Harris (2025 NY Slip Op 50383(U))

[*1]

Evans v Harris

2025 NY Slip Op 50383(U)

Decided on March 26, 2025

Supreme Court, Bronx County

Capella, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 26, 2025
Supreme Court, Bronx County

Jeanette Evans, as the Administrator of the Estate of HERBERT EVANS, deceased, and JEANETTE EVANS, individually, Plaintiffs,

against
Jonathan Samuel Harris, M.D., MICHAEL MARC GROSS, M.D., 
 PARK SOUTH MEDICAL, PLLC, ADVANCED UROLOGY CENTERS OF NEW YORK, and INTERGRATED MEDICAL PROFESSIONALS, PLLC, Defendants.

Index No. 20439/19

Plaintiffs' Attorney
Aleksey Feygin, Esq.
Mark M. Basichas & Associates, PC
233 Broadway, Suite 2707
New York, New York 10279
(212)476-0999
Dr. Gross' Attorney
Michele McEnroe, Esq.
Shaub, Ahmuty, Citrin & Spratt, LLP
1983 Marcus Avenue
Lake Success, New York 11042
(516)488-3300

Joseph E. Capella, J.

The following papers numbered 1 to 4 read on this motion.
PAPERS NUMBERED
NOTICE OF MOTION & AFFIRMATION 1
ANSWERING AFFIRMATION & MEMO OF LAW 2 - 3
REPLY AFFIRMATION 4
UPON THE FOREGOING CITED PAPERS, THE DECISION/ORDER IN THIS MOTION IS AS FOLLOWS:
Motion by defendant, Michael Marc Gross, M.D., for summary judgment (CPLR 3212) [*2]and dismissal of plaintiffs' complaint, which alleges medical malpractice, lack of informed consent and loss of services is granted in part. According to plaintiffs, Dr. Gross failed to timely diagnose prostate cancer, resulting in decedent being diagnosed at Montefiore Medical Center on August 29, 2018, with stage IV prostate cancer with metastatic disease which, at the time of diagnosis, effectively rendered him incurable, substantially worsening his prognosis and substantially diminishing his life expectancy. Dr. Gross has the initial burden to establish a prima facie showing of an entitlement to summary judgment as a matter of law by tendering sufficient evidence to eliminate any material issues of fact. (Alvarez v Prospect, 68 NY2d 320 [1986].) If he does, then the burden shifts to plaintiffs to produce evidentiary proof in admissible form sufficient to create issues of fact to warrant a trial (Alvarez, 68 NY2d 320), and denial of summary judgment.
In support of the motion, Dr. Gross argues that the cause of action for lack of informed consent should be dismissed because plaintiffs are not alleging that any of the injuries were caused by the affirmative performance of any procedure. Under New York Public Health Law § 2805-d, lack of informed consent is limited to those cases involving, inter alia, a diagnostic procedure that is invasive or disruptive of the integrity of the body. Here, plaintiffs' lack of informed consent claim is based on the alleged failure to either treat decedent, undertake a procedure or postpone a procedure, and as Dr. Gross correctly points out, none of these can form the basis for this cause of action. (Janeczko v Russell, 46 AD3d 324 [1st Dept 2007]; Sample v Levada, 8 AD3d 465 [2d Dept 2004].) Therefore, the lack of informed consent claim should be dismissed. As for plaintiffs' cause of action for loss of services, given that this is a derivative claim predicated upon the main action, dismissal of the main action would also require its dismissal. (Wittrock v Maimonides, 119 AD2d 748 [2d Dept 1986].) Lastly, in support of his request to dismiss plaintiffs' cause of action for medical malpractice, Dr. Gross provides expert affirmations from Dr. Guarionex Joel DeCastro, a board certified urologist, and Dr. Bobby Liaw, who is board certified in internal medicine and oncology. They both opine that Dr. Gross adhered to the standard of care and none of the alleged negligence was the proximate cause of decedent's injuries.
The prevailing standard of care governing the conduct of medical professionals demands that doctors exercise a reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where they practice. (Pike v Hosinger, 155 NY 201 [1898].) They are charged with the duty to exercise due care, which is measured against the conduct of their peers (i.e., the reasonably prudent doctor standard), and implicit in this concept is the principle that doctors must employ their best judgment in exercising their skill and knowledge. (Nestorowich v Ricotta, 97 NY2d 393 [2002].) Within the context of a medical malpractice action, as with any negligence action, plaintiffs must establish that Dr. Gross' negligence, which in this case is the alleged departure from good and accepted medical practice, proximately caused the injury claimed (Mortensen v Memorial Hospital, 105 AD2d 151 [1st Dept 1984]).
There is no dispute that defendants provided medical treatment to decedent during the period of January 2012 through August 2018, and that Dr. Gross only treated decedent during the period of August 10, 2017, through August 13, 2018. According to co-defendant, Dr. Jonathan Samuel Harris, decedent developed a burning sensation with urination in July 2017, which did [*3]resolve by August 1, 2017, at which point decedent agreed to see a urologist. Decedent then saw Dr. Gross on August 10, 2017, at which time Dr. Gross conducted a physical exam which included, inter alia, a digital rectal exam (noting an enlarged prostate), urine cultures and urine analysis (both negative). According to Dr. Gross, he offered decedent a screening PSA, which decedent declined.[FN1]
Dr. Gross and his experts all agree that screening for PSA is not the standard of care for a 76-year old male like decedent. Decedent saw Dr. Gross again on September 25, 2017, and was prescribed a sulfur medication to treat dysuria. On January 19, 2018, decedent presented to Westchester Square Hospital for acute urinary retention, and a Foley catheter was placed to drain his bladder. 
On January 23, 2018, decedent returned to Dr. Gross with the Foley catheter, at which time he was diagnosed with benign prostatic hyperplasia with urinary retention, and prescribed Rapaflo and prophylactic Bactrim. On February 9, 2018, Dr. Gross performed a transurethral vaporization of the prostate (TUVP) — no tumors were visualized, but trabeculation [FN2]
was present. On February 14, 2018, decedent's bladder was irrigated, and he was continued on alfuzosin, Bactrim and finasteride, and these medications were continued on August 13, 2018, which is the last office visit with Dr. Gross. According to Dr. DeCastro, given the stage of decedent's prostate cancer in August 2018, "which included and metastases to the spine and pelvis, it is certain that [decedent] harbored metastatic disease in August 2017 when he was first evaluated by Dr. Gross. This means that [decedent] presented to Dr. Gross at the first office visit with stage IV prostate cancer. Performance of a transurethral resection of the prostate (TURP) in February 2018, instead of the TUVP, would have yielded prostate tissue which would have resulted in the diagnosis of [decedent's] prostate cancer six months earlier. However, it is certain that [decedent] had metastatic prostate cancer at that time, and so his prognosis or treatment options would have been the same." Dr. Liaw opines "that [in] August 2017 the [decedent's] prostate cancer was controllable for a period of time with the available medical therapies, but not curable at that time. This is essentially the same circumstance that [decedent] was in when the prostate cancer was diagnosed in August 2018."
Both experts opine to a reasonable degree of medical certainty that the care provided by Dr. Gross was appropriate and timely, and did not deviate or depart from the standards of accepted medical practice. They opine that earlier diagnosis of prostate cancer in August 2017 would not have altered the progression in any meaningful way. And even if decedent's prostate cancer treatment started one year earlier than it ultimately did in August 2018, decedent's prognosis and life expectancy would not have been significantly altered. Based on the aforementioned, the Court is satisfied that Dr. Gross has met his burden for summary judgment, (Zuckerman v City of NY, 49 NY2d 557 [1980]; Kaffka v NY Hospital, 228 AD2d 332 [1st Dept 1996]), which now shifts to plaintiffs to demonstrate that issues of fact exist to warrant a trial.
Plaintiffs' opposition papers do not address lack of informed consent; therefore, this cause of action is dismissed accordingly. As for the medical malpractice cause of action, plaintiffs [*4]provide name-redacted [FN3]
expert affirmations by a board certified urologist, and a physician who is board certified in internal medicine with sub-certifications in oncology and hematology. As previously noted, Dr. Gross' experts opined that a PSA test for screening purposes was not required because decedent was 76 years old and the cutoff point is generally 72. However, according to plaintiffs' experts, this was not an instance for either a screening or a baseline study because decedent already had a history of elevated PSA tests. Therefore, repeating a PSA test was required and in accordance with the standard of care. They also note that although decedent's complaint of dysuria and nocturia may be attributed to benign etiology (BPH), given the prior elevated PSA levels, prostate malignancy should have been included as part of a differential diagnosis, and a further PSA test was warranted. They also opine that Dr. Gross' failure to perform a prostate biopsy during the cystoscopy and TUVP was a departure from accepted standard of care. These experts also note that despite the TUVP, decedent returned to Dr. Gross in April and again in August with continued complaints of dysuria, which suggested that the urinary symptoms were not caused by a benign enlarged prostate as Dr. Goss erroneously suspected.
Plaintiffs' experts also note that a urinalysis performed on April 13, 2018, once again revealed the presence of blood (hematuria), which Dr. Gross' experts attributed to the TUVP. According to plaintiffs' experts, Dr. Gross' experts failed to appreciate the fact that decedent had hematuria before the TUVP. They also disagree with the suggestion by Dr. Gross' experts that the blood may be due to the Foley because hematuria should not be present months after the Foley insertion and removal. According to plaintiffs' experts, Dr. Gross failed to determine the cause of decedent's hematuria in April 13, 2018, at which time a PSA test, and a prostate MRI followed by prostate biopsy was warranted. Plaintiffs also note that contrary to Dr. Gross' allegations, decedent denied that a PSA test was ever offered by Dr. Gross during any of the visits. Plaintiffs' urologist opines that Dr. Gross negligently delayed the diagnosis and commencement of treatment by one year. According to plaintiffs' oncologist, in August 2017, when decedent first presented to Dr. Gross he did not suffer from stage IV metastatic prostate cancer as alleged by Dr. Gross' experts. Instead, plaintiffs' oncologist opines that in view of the rate of growth of prostate cancer, decedent suffered from a localized prostate cancer, and had a diagnosis been made at that time, decedent would have had a substantially improved prognosis and longer life expectancy. One year later, in August 2018 decedent was diagnosed with diffuse bone metastasis throughout the spine. According to plaintiffs' oncologist, decedent could not have had bone metastasis one year earlier and remained without the severe and excruciating back pain symptoms that are associated with spinal metastasis.
Plaintiffs disagree with Dr. Gross' proximate cause argument that even if decedent's prostate cancer was discovered and treated one year earlier than it ultimately was in August 2018, decedent's prognosis and life expectancy would not have been significantly altered. They note that Dr. Liaw essentially concedes that the delay in diagnosing prostate cancer increased decedent's injuries when he stated that decedent "would have required the same treatment . . . with the exception of possibly not requiring palliative radiation to treat [decedent's] uncontrolled symptomatic spinal metastases." They also note that Dr. Liaw concedes that decedent [*5]experienced the side effects of radiation treatment that included nausea and vomiting. Although curing cancer is the ultimate aspiration, it is not the only positive treatment outcome. (Polanco v Reed, 105 AD3d 438 [1st Dept 2013].) And the issue as to whether a diagnostic delay affected a patient's prognosis is one typically reserved for the trier of fact. (Id.) In medical malpractice actions, where causation is a difficult issue, a plaintiff need only offer sufficient evidence from which a reasonably prudent person might conclude that it was more probable than not that the injury was caused by defendant. (Neyman v Doshi, 153 AD3d 538 [2d Dept 2017]; Flaherty v Fromberg, 46 AD3d 743 [2d Dept 2007].) In other words, plaintiffs' evidence may be deemed legally sufficient even if its experts cannot quantify the extent to which Dr. Gross' act or omission decreased decedent's chance of a better outcome or increased his injury, as long as evidence is presented from which a jury may infer that his conduct diminished decedent's chance of a better outcome or increased his injury (Neyman, 153 AD3d 538).
Viewing the evidence in a light most favorable to plaintiffs, (O'Sullivan v Presbyterian, 217 AD2d 98 [1st Dept 1995]), the Court is satisfied that sufficient issues of fact exist to warrant denial of Dr. Gross' request to dismiss the medical malpractice cause of action. And given the survival of this claim, plaintiffs' derivative claim for loss of services likewise survives. As previously mentioned, however, that portion of the motion seeking dismissal of plaintiffs' lack of informed consent cause of action is granted. Plaintiffs are directed to serve a copy of this decision with notice of entry upon all sides within 20 days of receipt of copy of same. This constitutes the decision and order of this court.
Dated 3/26/25
Joseph E. Capella, J.S.C.

Footnotes

Footnote 1:Plaintiffs allege that Dr. Gross never offered a PSA test; therefore, they deny this allegation.

Footnote 2:A thickening of the bladder walls.

Footnote 3:(CPLR § 3101(d)(1)(I); Rivera v Albany, 119 AD3d 1135 [3d Dept 2014].)